**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**


DAVID GIVENS,                  )
                                  )
            Plaintiff,        )
                                    )
       v.                         )     Case No. 09-4135-CV-C-NKL
                                    )
THE PRUDENTIAL INSURANCE    )
COMPANY OF AMERICA,         )
                                    )
            Defendant.  

**ORDER**

Plaintiff David Givens ("Givens") claims that the Prudential Insurance Company of America ("Prudential"), wrongfully terminated his benefits under a long-term disability plan ("plan") in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. ("ERISA"). Prudential denies this claim, arguing that Givens was able to be gainfully employed in alternate occupations and, thus, did not qualify for benefits under the plan beyond twenty-four months. Pending before the Court are cross-motions for summary judgment [Docs. # 29; # 30]. For the following reasons, the Court DENIES Prudential's motion for summary judgment [Doc. #29] and GRANTS Givens' motion for summary judgment [Doc. #30].

**I.**      **Factual Background**

       **A.**      **Medco's Long-Term Disability Plan**

Givens was employed at Medco as a pharmacy technician, a light duty level occupation. [Doc. #39, ¶ 1]. The job required pushing a cart, lifting between five and forty-five pounds from carts and shelves, sitting for long lengths of time, and lifting over ten pounds between two to eight times per day. [Doc. #29-5, at D0293-D0294].

Givens participated in a Medco-sponsored long-term disability plan, which is subject to ERISA, 29 U.S.C. §§ 1001, et seq. The plan is insured by Prudential under group contract number 22283, [Doc. #39, ¶ 2], and provides benefits to employees if they become disabled. Under the plan, a participant is disabled:

[W]hen Prudential determines that:

[the participant is] unable to perform the material and substantial duties of [his] regular occupation due to [his] sickness or injury; and [he has] a 20% or more loss in [his] indexed monthly earnings due to that sickness or injury.

[Doc. #29-13, at D0830]. The plan further provides:

After 24 months of payments, [the participant is] disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which [the participant is] reasonably fitted by education, training or experience.

. . . .

Material and substantial duties means duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified, except that if [the participant] are required to work on average in excess of 40 hours per week, Prudential will consider [the participant] able to perform that requirement if [the participant] are working or have the capacity to work 40 hours per week.

Regular occupation means the occupation [the participant is] routinely performing when [his] disability begins. Prudential will look at [the participant's] occupation as it is normally performed instead of how the work

tasks are performed for a specific employer or at a specific location.

Gainful occupation means an occupation, including self employment, that is or can be expected to provide [the participant] with an income equal to at least 60% of [the participant's] indexed monthly earnings within 12 months of [his] return to work.

Sickness means any disorder of [the participant's] body or mind, but not an injury . . . . Disability must begin while [the participant is] covered under the plan.

Injury means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before [the participant is] covered under the plan will be treated as a sickness. Disability must begin while [the participant is] covered under the plan.

[Doc. #29-13, at D0830].

[Prudential] will stop sending [the participant] payments and [a participant's] claim will end on the earliest of the following: (1) . . . after 24 months of payments, when [the participant is] able to work in any gainful occupation on a part-time basis but [he] choose[s] not to." . . . (4) The date you fail to submit proof of continuing disability satisfactory to Prudential.

[Doc. #29-13, at D0837].

**B.   Givens' Claim History**

In March 2004, Givens was involved in a motor vehicle accident. [Doc. #39, ¶ 7]. In

October 2004, Givens stopped working due to pain. [Doc. #31, ¶ 4]. After applying for and

appealing an initially unfavorable decision, Prudential paid Givens short-term disability

benefits through April 3, 2005. [Doc. #31, ¶ 6]. Givens then attempted to return to work, but

was unable to perform the duties of his former occupation as a pharmacy technician. [Doc.

# 31, ¶ 7]. Givens went out of work on February 24, 2006. [Doc. #39, ¶ 8]. He applied for

long-term disability benefits on August 11, 2006. [Doc. #31, ¶ 7]. After initially denying

Givens' claim in a letter dated November 22, 2006, [Doc. # 31, ¶ 9], Prudential upheld its denial in a letter dated June 14, 2007 in response to Givens' first appeal. [Doc. #31, ¶ 11].

Givens filed a second appeal on July 9, 2007. [Doc. #29-9, at D0601]. In support of his appeal, Givens notified Prudential that the Social Security Administration found that he was disabled from March 1, 2006 and was entitled to disability benefits beginning August 2006. [Doc. #29-9, at D0603-D0610]. On August 1, 2007, Prudential acknowledged receiving this information, [Doc. #29-10, at D0755], and on September 10, 2007, it notified Givens that Dr. Joann Mace would conduct an independent medical examination as part of Prudential's review of Givens' second appeal. [Doc. #29-10, at D0749]. In a letter dated October 16, 2007, Prudential approved Givens' claim for long-term disability benefits effective August 23, 2006 after finding that he was "currently disabled from his regular occupation." [Docs. # 36, ¶ 6; #31, ¶ 16]. Givens received two years of disability benefits. [Doc. #39, ¶¶ 9-10].

In March 2008, Prudential reminded Givens that as of August 23, 2008, after twenty-four months of payments, Prudential's definition of disability would change to "unable to perform the duties of any gainful occupation" for which Givens was "reasonably fitted by education, training or experience." [Docs. # 31, ¶ 18; #29-10, at D0742]. In its letter, Prudential stated: "A review of the medical records from your providers indicated that reasonable restrictions and limitations would impact your ability to perform your regular occupation; however, our review demonstrates that you have the capacity to return to another occupation for which you are reasonably fitted by your education, training and experience."

[Doc. # 36, ¶ 7 (citing D0743)]. In a letter dated July 17, 2008, [Doc. # 29-10, at D0733-D0736], Prudential informed Givens that no benefits would be payable beyond August 22, 2008 because the medical evidence did not support a finding that Givens had an impairment that prevented him from performing the material and substantial duties of any gainful occupation for which he was reasonably qualified. [Doc. #39, ¶ 11]. Prudential indicated in its letter that it based its decision in part on the results of Dr. Joann Mace's September 24, 2007 exam and on the report of a vocational consultant who identified several gainful occupations that Givens could perform. [Docs. # 31, ¶¶ 22, 24; #29-10, at D0734].

On March 11, 2009, Givens appealed Prudential's decision to terminate his benefits. As part of his appeal, Givens submitted updated medical information including notes from office visits with Dr. Silney from December 4, 2008 to January 16, 2009, [Doc. #29-6, at D0404-D0415], and a report from rehabilitation consultant Lesa Keen. [Doc. #29-6, at D0450-0458]. On April 17, 2009, Prudential denied Givens' appeal. Prudential explained that an independent physician had reviewed the file and determined that Givens did not have any functional impairment from August 23, 2008 onward, nor did he have any medically supported restrictions and limitations. [Doc. #39, ¶ 12]. The physician also opined that Givens' self-reported complaints of pain were not consistent with or supported by the diagnostic testing results or physical examination findings. Prudential noted that Givens received Social Security disability benefits but explained that approval for such benefits did not automatically result in approval for disability benefits under the Plan. [Doc. #39, ¶ 12]. Givens then filed this lawsuit on July 16, 2009. [Doc. #1].

**C.    Givens' Medical History and Reviews**

Approximately each month since his March 2004 car accident through the date of his last records on file, Givens has been treated and examined by physicians, physician assistants ("PA-C"), chiropractors, radiologists, neurologists, or other specialists.

### 1. Medical History and Reviews through October 2007

On March 15, 2004, Givens saw Liza Bryant, PA-C, who prescribed ibuprofen to help Givens manage the pain in his right low back, right leg, hip, knee, and ankle. [Docs. #31, ¶¶ 43-45; #29-4, at D0207]. On March 23, 2004, Givens was examined by Lance Alee, MPT, upon recommendation by PA-C Bryant. [Doc. #31, ¶ 46]. The exam revealed moderate to severe tenderness over the right SI region, and moderate hypertonicity of the lumbar spine. Givens was unable to sit or bend for more than five to ten minutes without increasing symptoms, lost lumbar extension, and suffered pain with weightbearing through his low back, right SI region. [Doc. # 31, ¶ 49]. One week later on March 30, 2004, Givens followed up with PA-C Bryant, who noted that Givens continued to experience low back pain and a stabbing pain to his buttocks region. [Doc. #31, ¶ 50]. PA-C Bryant ordered an x-ray of Givens' back and instructed him to follow-up if physical therapy did not resolve his back pain. [Doc. #31, ¶ 51].

On April 8, 2004, Givens followed-up with PA-C Bryant to discuss his x-ray results. [Doc. #29-4, at D0211]. The x-ray revealed an acute angulation at the sacrococcygeal articulation, "which may represent prior trauma, or a congenital variant," and mild

degenerative changes in the posterior elements from L3 through S1. [Docs. #31, ¶ 52; #29-4, at D0210]. Givens complained that he had pain going down his legs and that his legs were going numb. [Doc. #31, ¶ 53]. Following the recommendations of PA-C Bryant, Givens continued physical therapy on seven occasions between March 24, 2004 and April 26, 2004. [Doc. #31, ¶ 54].

Givens followed up with PA-C Bryant again on May 11, 2004. He stated that "pain will start in his back and radiate to his mid spine." [Doc. #29-4, at D0213]. He also stated that he experienced tingling and numbness in his legs, but that physical therapy and chiropractic sessions have helped. [Doc. #29-4, at D0213]. On May 25, 2004, Givens obtained an MRI of his thoracic spine. [Doc. #31, ¶ 57]. The MRI showed a T7-8 small focal posterior right paramedian disc protrusion. No fracture was found. [Doc. #29-4, at D0214]. An MRI of the lumbar spine taken on May 26, 2004 showed degenerative disc changes at T10-11, degenerative disc changes with a minor impression on the thecal sac at T11-12, and minor degenerative changes at L5-S1, all "without significant neural impingement." [Doc. #31, ¶ 59; #29-3, at D0083].

Givens continued to follow-up with PA-C Bryant on June 11, 2004 and June 23, 2004. At these visits, Givens complained of low back and buttocks pain that radiated down to his legs, neck and back pain [Doc. #31, ¶¶ 60-62]. On June 29, 2004, Givens was discharged from physical therapy because his condition did not improve despite good compliance with treatment. [Doc. #31, ¶ 63]. Dr. Daniel Lee performed an orthopedic evaluation on July 8, 2004 and found that Givens "has lumbar enthesopathy, fibromyalgia, pain syndrome." [Docs.

#31, ¶¶ 64-68; # 29-4, at D0245]. Dr. Lee referred Givens to neurology and pain management, and prescribed Darvocet for pain. [Doc. #31, ¶ 69].

For the next several months until October 2004, Givens' pain did not improve. He followed up with Bryant three more times, was seen by Dr. Dean Tsai and Cathy Schwabe, PA-C, visited urgent care, and resumed physical therapy. [Doc. #31, ¶¶ 71-84]. At an August 24, 2004 appointment with PA-C Schwabe, she noted that after reviewing Givens' chart and completing a physical assessment of him, she "[did] not see anything wrong." [Doc. #29-4, at D0226]. Although she indicated she would write a referral for Givens to seek a second opinion, PA-C Schwabe "[did] not believe there is any reason that [Givens] cannot do routine work at his job and therefore the form will be faxed back to his insurance stating that there does not appear to be any restrictions." [Doc. #29-4, at D0226]. Givens returned to the medical office a couple of days later on August 26, 2004 to dispute PA-C Schwabe's work evaluation, but Dr. Tsai informed Givens that the work evaluation "would not be revised, as that was the medical opinion at time of completion." [Doc. # 29-4, at D0227]. The next day, Givens visited urgent care to request that they complete his work restrictions paperwork. [Doc. #29-4, at D0228]. He stated that "since doing full work, he has noted that [his chronic back pain] is worsening, that he was having more numbness down his lower extremities." [Doc. #29-4, at D0228]. Urgent care informed Givens that they could not complete his paperwork, but gave him some samples of Skelaxin. [Doc. #29-4, at D0228].

A few days later, on August 30, 2004, Givens again saw PA-C Schwabe, complaining of "low back pain associated with heavy lifting, long periods of standing, and also pushing

his cart at work." [Doc. #29-4, at D0230]. After consulting with Dr. Tsai, PA-C Schwabe extended Givens' work release until he set-up a follow up appointment with a second orthopedist. [Doc. #29-4, at D0231]. On September 9, 2004, PA-C Schwabe indicated the following restrictions for Givens, lasting for one month until October 9, 2004, on a "Restricted Duty Status Report": no lifting more than ten pounds; no lifting fewer than ten pounds more than one to two hours per day; no standing more than two to four hours a day (though elsewhere on the report, she wrote "David should not be standing > 1 hr"), bending more than two hours a day, stooping more than two hours a day, and pulling/pushing more than one hour a day, and twisting or reaching above his shoulders for more than one to two hours a day. [Doc. #29-4, at D0232]. On October 7, 2004, Givens was discharged from physical therapy due to lack of improvement. [Doc. #31, ¶¶ 80-81]. At his follow-up appointment with PA-C Bryant on October 8, 2004, Bryant continued Givens' light duty work restrictions until his scheduled orthopedic exam on October 19, 2004. [Doc. #29-4, at D0233]. PA-C Bryant additionally noted that Givens had been seen by Dr. Boulware and that when she spoke with Dr. Boulware, he stated "he can find nothing wrong with the patient." [Doc. # 29-4, at D0233]. On October 15, 2004, Givens saw Charles McSwain, DO, who filled out Givens' work restrictions paperwork and instructed Givens to avoid lifting more than ten pounds and to avoid long hours of standing and walking. [Doc. #29-4, at D0235]. Dr. McSwain noted that Givens "seems to be in minimal if any pain." [Doc. #29-4, at D0235]. On October 19, 2004, Dr. Patrick McNulty performed an orthopedic evaluation of Givens and diagnosed him with cervicothoracic and lumbar syndrome. [Doc. #29-4, at

D0243]. He also noted that Givens had a few areas of cervicothoracic and lumbar pain with both upper and lower extremity paresthesias/radiation, and that Givens "could not really localize any particular area of the spine as being worse and generally, he is not a good candidate for structural spine surgery per se." [Doc. #29-4, at D0243-D0244]. On October 22, 2004, Givens again saw Dr. McSwain to complete FMLA paperwork. [Doc. #29-4, at D0236]. Due to Givens' "ongoing workup," Dr. McSwain found that Givens' request for restricted or light duty to avoid heavy lifting was not unreasonable. [Doc. #29-4, at D0236].

MRIs were taken of Givens' cervical spine and lumbar spine on November 17, 2004. The cervical spine MRI demonstrated a syrinx involving the thoracic spinal chord centered at level T5. Additionally, the MRI revealed mild diffuse disc bulges, most prominent at C3-4 and C4-5, and a degenerative disc disease was "quite minimal." [Docs. #39, ¶ 13; #29-3, at D0081-D0082]. On November 25, 2004, Dr. McSwain issued a note that stated: "Mr. Givens remains disabled and needs extension of incapacity thru 12/29/04." [Doc. #29-3, at D0098]. On January 6, 2005, Givens saw Crispino Santos, M.D. upon referral by Dr. McNulty. [Doc. #29-4, at D0176]. Dr. Santos reviewed Givens' medical records and physically examined him. His assessment included: "Chronic cervical, thoracic, and lower back pain. Mild cervical disc bulge at C2, C3, C3-4, C4-5 and C5 C6[;] T7 T8 disc protrusion[;] Mild degenerative disc disease T10-11, T11 T12, L5-S1[;] Cervical, thoracic lumbar and enthesopathy." [Doc. #29-4, at D0176]. Dr. Santos further noted that Givens was not taking any medication at the time of the visit, but prescribed 250 mg of Limbrel, twice daily. He planned to follow-up with Givens in one month, after Givens scheduled thoracic MRI on

January 11, 2005. [Doc. #29-4, at D0176].

Givens' January 11, 2005 MRI resulted in "stable" findings, including a note that the "previously described small syrinx is again identified which is slightly longer as compared to previous study. This now measures 3 cm in length." [Doc. #29-3, at D0079-D0080].

Also on January 11, 2005, Givens was evaluated by Steven Olenchak, PA-C, at the Advanced Spine and Rehabilitation clinic. [Doc. #31, ¶ 97]. Although Givens brought MRIs for review, PA-C Olenchak stated that "there is insufficient data to make a diagnosis, or formulate a treatment plan." [Doc. #29-3, at D0010]. However, based on his clinical impressions of Givens and Givens' complaints of "frequent headaches and occasional dizziness," "neck, mid back, right ankle and buttock pain with associated right lower extremity radiations," "two episodes of bilateral upper extremity numbness that lasted for a few minutes," and a pain intensity of 7/10, PA-C Olenchak stated: "It is my professional opinion the patients [sic] mechanism of injury, subjective complaints, and objective findings are consistent and causally related to the motor vehicle accident in question." [Doc. #29-3, at D0010]. Givens completed a "Functional Rating Index Questionnaire," and based on his answers, he was placed in the "perceived completely disabled" category. [Doc. #29-3, at D0010]. Givens followed-up with PA-C Olenchak on January 20, 2005 after he had been evaluated by Dr. McNulty on January 18, 2005 and referred Givens to a neurologist. [Doc. #29-3, at D0119]. Givens again saw PA-C Olenchak on January 21, 2005 to bring in the remainder of his MRI films. At that time, he did not yet have an appointment with a neurologist. [Doc. #29-3. at D0121]. Also on January 21, 2005, Givens met with Roger

11

Russell, DC, MS, FACO, for a chiropractic consult. Dr. Russell postponed treatment until Givens' MRI films were evaluated by a neuroradiologist and Givens was examined by a neurologist. [Doc. #29-3, at D0124].

On January 25, 2005, Givens was seen by Dr. Santos, who noted that most of Givens' pain was in the upper thoracic spine. [Doc. #29-4, at D0138]. Because Givens reported that he did not notice any improvement while taking Limbrel, Dr. Santos recommended 5 mg of Lortab every six hours for pain. Dr. Santos noted that Dr. McNulty had referred Givens to a neurosurgeon for evaluation. [Doc. #29-4, at D0138].

On February 1, 2005, neuroradiologist Dr. William Orrison, evaluated Givens' thoracic and lumbar spine MRIs from May 25, 2004 and May 26, 2004. [Doc. #31, ¶ 115]. He concluded: "findings consistent with syringohydromyelia at the T4-5 and T5 levels within the thoracic spinal cord and intervertebral disc bulge at T7-8." [Doc. # 29-3, at D0077]. On February 14, 2005, Dr. Nicole Theuvenet conducted a neurology evaluation of Givens and ordered MRIs of Givens' brain and lumbosacral spine, and an EMG and EEG. [Doc. #29-4, at D0143-D0144]. Givens' subsequent MRI of his lumbar spine, taken on February 25, 2005, were evaluated by Dr. Orrison. [Doc. #29-8, at D0530]. He concluded: "Six lumbar type vertebral bodies with lumbarization of S1[;] L5-lumbarized S1 intervertebral disc bulge to the left with mild neural foraminal narrowing on the left[;] Multilevel facet arthropathy." [Doc. #29-8, at D0530]. Givens followed-up with Dr. Theuvenet on March 1, 2005. The results of Givens' brain MRI, EEG, and EMG were all normal. [Doc. #29-4, at D0145]. Givens informed the doctor that there were no significant changes in his symptoms, which

included "neck pain predominantly musculoskeletal in origin[,] . . . intermittent [numbness] in his arms[,] . . . [l]ow back pain with associated radicular symptoms." [Doc. #29-4, at D0145]. Dr. Theuvenet also noted "thoracic syrinx but with no associated neoplasm or structure abnormality involving the brain." [Doc. #29-4, at D0145].

About one week later on March 8, 2005, Givens was seen for a neurosurgical consultation with Dr. Albert Capanna. Dr. Capanna reviewed Givens' records and images and physically examined Givens. He diagnosed Givens with: "Thoracic Syrinx T4-5[;] Minimal Degenerative changes Cervical[;] Minimal Thoracic Disc T7-8[;] Fibromyalgia[;] Minimal Left L5-S1 disc." [Doc. #29-4, at D0131]. Surgery for the syrinx was not recommended and he added that "[t]he syrinx does not explain his problems at all in my opinion." [Doc. #29-4, at D0131]. Two days later, Givens saw Dr. Santos on March 10, 2005 for a follow-up and refill on his medication, Lortab, which Givens indicated "makes the pain tolerable." [Doc. #29-4, at D0136]. Dr. Santos recommended that Givens stay on oral medication and only consider thoracic epidural injection when the oral medication was no longer effective, and explained to Givens that he was "not aware of any studies that shows taking narcotic medications have any type of impairment or that will affect his work." [Doc. #29-4, at D0136]. Dr. Santos noted that Givens' physical examination was unchanged from his January 25, 2005 visit. [Doc. #29-4, at D0136].

Later that March, Neurosurgeon Dr. Lonnie Hammargren evaluated Givens and wrote a letter to Dr. Theuvenet dated March 30, 2005. She wrote: "[Givens] has a tiny tiny syrinx, cannot cause pressure or pain. He is asymptomatic. His reflexes are normal. His sensory

exam is normal, his motor exam is normal. Anyone who says that he is symptomatic and it needs to be treated - it just ain't so. There is no treatment for this. It is a normal congenital variant. It is not causing any pressure or neurological deficit and he does not need any surgery, injections, MRIs, doesn't need anything." [Doc. #29-4, at D0134]. On April 7, 2005, Givens returned to see PA-C Olenchak, who noted Dr. Hammargren's evaluation and Givens' complaints of continued neck, upper back, and low back pain. [Doc. #29-3, at D0021].

Givens received chiropractic care from Dr. Russell and Kelly Murie, DC during six visits between April 11, 2005 and April 22, 2005. [Doc. #29-3, at D0022-D0033]. Based on Givens answers to a Functional Rating Index Questionnaire administered by Dr. Rusell on April 11, Givens was placed in the "perceived completely disabled" category. [Doc. #31, ¶ 132].

Givens followed-up with PA-C Olenchak four times between April 28, 2005 and June 13, 2005. During this period, PA-C Olenchak wrote several notes and letters indicated that Givens was to "remain off work pending treatment outcomes," or was " unable to perform any type of work due to his current condition," or was "currently under total temporary disability." [Doc. #31, ¶¶ 138-141, 143-145, 147-152]. During this period, PA-C Olenchak also monitored Givens' pain and progress in the MedX strength rehabilitation program, which Givens commenced after being evaluated as having "strength deficits of greater than 80% in all (7/7) test positions." [Doc. #29-3, at D0036].

After returning to work for several months, on March 1, 2006, Givens returned to Dr.

Russell and complained of persistent neck and back pain and that he makes many mistakes at work when he is on pain medication, and requested "to be placed on disability." [Doc. #29-8, at D0536]. Dr. Russell responded by finding that Givens would benefit from continuing to work and therefore placed Givens on modified duty, limiting Givens to no lifting over twenty pounds or any repetitive lifting. [Doc. #39, ¶ 15].

Over one week later on March 9, 2006, Givens returned to see PA-C Olenchak, who refilled Givens' medication, ordered a repeat MRI, and referred him to Dr. William Muir, an orthopedic spine surgeon, for evaluation. [Doc. #39, ¶ 16]. Givens complained of "right sided neck and low back pain which is aggravated with work activities. . . . and pain radiation into his right upper and lower extremities." [Doc. #29-8. at D0538]. On March 15, 2006, Givens underwent an MRI scan of his thoracic spine. The findings were consistent with post-traumatic syringohydromyelia and included "abnormal increased signal intensity centrally within the spinal cord extending from approximately T2 through T6-7 . . . . [N]o evidence of abnormal contrast enhancement to suggest an active inflammatory or neoplastic process. . . . Mild . . . posterior disc bulges are identified at T7-8, T9-10 and T11-12 without evidence of significant narrowing of the spinal canal or neural foramina." [Doc. #29-8, at D0529]. On March 20, 2006, Givens returned to PA-C Olenchak. Just as with the earlier March evaluation, PA-C Olenchak graded Givens' reflexes and sensation a +2/2 and strength a +5/5. Additionally, his voluntary motor function was within normal limits, and fine dexterity was intact. PA-C Olenchak noted that Givens' recent thoracic MRI revealed syringohydromyelia and referred Givens to Dr. Theuvenet for further evaluation. [Docs. #39, ¶ 18; #29-8, at

D0540]. Givens again followed up with PA-C Olenchak on March 26, 2006 for a lumbar functional capacity reevaluation. Test results revealed increased strength in four of seven planes tested. Givens indicated that the treatment was helping and that he would like to continue. [Doc. #39, ¶ 19].

On May 5, 2006, a physician identified only by the initials "ECW" treated Givens. Givens reported to ECW that he had been diagnosed with phryngomyela in the thoracic spine. However, ECW stated that it appeared that "neurosurgery does not feel that this [diagnosis] is contributing to any back pain" and that Givens' complaints of weakness were "questionable." [Doc. #29-9, at D0580]. Further, ECW noted that Givens gave "basically inappropriate explanations for his condition." After examining Givens, ECW noted that Givens was in "no acute distress" and "d[id] not actually appear in much discomfort." ECW concluded that "it is hard for me to exactly understand the reasoning for disability at this point" despite Givens informing ECW that he "was on disability due to his narcotic use making him unable to work as opposed to limitations of his actual injury." [Doc. #39, ¶ 20]. ECW assessed Givens with "[c]hronic back pain, uncertain etiology, likely musculoskeletal." [Doc. #29-9, at D0581]. Because Givens reported that he taxes Oxycodone 5 mg QID, ECW continued that prescription. [Doc. #29-9, at D-581].

On May 19, 2006, ECW again saw Givens. Based on records given to ECW by Givens, ECW found that one of the MRIs "showed some very mild degeneration in [Givens'] syrinx. General surgeons feel the syrinx is not causing any symptoms as it is relatively small. Orthopaedic surgeon felt that the discs were not a significant problem." [Doc. #39, ¶ 21].

ECW noted that Givens could move easily during the exam and that Givens stated he drove in to work even though he complained that his narcotics altered him enough to impact his work. ECW told Givens that he had significant questions and concerns about his disability. [Doc. #39, ¶ 21].

On July 24, 2006, Givens saw Dr. Brad Noble at Boone Hospital Center Pain Management Clinic. Dr. Noble noted that Plaintiff was awake, alert, and in no distress. He suggested lumbar interlaminar epidural steroid injection, but Givens declined. [Doc. #39, ¶ 23].

From the time of his accident through October 1, 2007, Givens had seen Dr. Carolle Silney six times: June 26, 2006, July 10, 2006, July 27, 2006, September 11, 2006, October 11, 2006, February 9, 2007, and March 9, 2007. [Doc. #39, ¶ 22; #29-6, at D0389, D0525-D0527, D0571]. Dr. Silney noted that the reason for Givens' June 2006 visit was to establish care because "he needs to be under the care of a physician in order to maintain [disability] status." [Doc. #29-8, at D0523]. At that visit, Dr. Silney noted that "[s]everity [of lumbosacral spine pain] is moderate," and that Givens requested an increase in his Oxycontin prescription. [Doc. #29-8, at D0523-D0524]. Dr. Silney increased Givens dosage to 10 mg. [Doc. #29-8, at D0523].

It appears that Givens resumed chiropractic treatments with two different chiropractors in June 2006. According to a physician's report, Givens was treated by Dr. Alicyn Boehmer on June 21, 2006. His planned treatment included three visits per week for one month, followed by two visits per week for one month. [Doc. #29-8, at D0516].

Treatment notes in the record indicate subsequent treatment only on July 5, 2006, July 27, 2006 (or July 21, 2006–the handwriting is unclear), and September 6, 2006. Separately, on June 29, 2006, it appears that Givens saw a chiropractor named "Dr. Menard" [Doc. #29-6, at D0342], who then treated Givens from February 9, 2007 to May 1, 2007. [Doc. #29-6, at D0343-D0349]. On Givens' patient registration form at Dr. Menard's office, Givens indicated in a checkbox format that he experienced constant severe pain that was sharp, burning, tingling, throbbing, shooting, aching, and numbness. [Doc. #29-6, at D0343]. Also in a checkbox format, Givens indicated that it was painful for him to sit, stand, walk, bend, and lie down, and that the pain interfered with his work, sleep, daily routine, and recreation. Givens also indicated that his condition was not getting progressively worse. [Doc. #29-6, at D0343].

At Dr. Silney's July 10, 2006 follow-up with Givens, she noted that the chiropractic care was making his sharp pain worse. [Doc. #29-8, at D0524]. Dr. Silney completed Prudential's "Group Disability Insurance Attending Physician's Statement" at Givens' July 27, 2006 visit, stating that Givens' medical obstacles to return to work included "continuous back pain, difficulty performing tasks at work, and difficulty concentrating due to pain meds," and restricted Givens from lifting more than ten pounds and from bending, squatting, or pushing. [Doc. #29-6, at D0389-D0390]. She further indicated "none" in the "functional abilities" section of the form. [Doc. #29-6, at D0389]. When Givens saw Dr. Silney for "counseling . . . no exam" on September 11, 2006, she recommended a trial of Lyrica for his pain. [Doc. #29-8, at D0526]. Givens indicated that he "feels the same" except that the pain

feels "more like a needle through his back." [Doc. #29-8, at D0526]. At a follow-up exam on October 11, 2006, Givens informed Dr. Silney that he stopped taking Lyrica after one week because it did not help with his pain and made him sleepy, incoherent, and confused. [Doc. #29-8, at D0571]. Givens also indicated that his back pain was "about the same." [Doc. #29-8, at D0571]. Dr. Silney continued Givens' Oxycontin prescription.

In February 2007, Dr. Silney found that Givens' spine was positive for posterior tenderness but no paravertebral spasm; Givens had diffuse muscle tenderness over his back with mild palpation and some symptoms magnification; and that Givens was alert and oriented. [Doc. #39, ¶ 24]. Dr. Silney continued Givens' Oxycontin prescription. Also at this visit, Dr. Silney completed, with Givens' help, [Doc. # 29-6, at D0351], a "Medical Source Statement-Physical" form provided by Givens' lawyer. [Doc. #31, ¶ 187]. On that form, Dr. Silney indicated that Givens had the maximum capacities to: occasionally lift five pounds for about thirty minutes to an hour, stand or walk continuously for sixty minutes, sit continuously for sixty minutes, and push or pull for about one hour. Dr. Silney also indicated that Givens could never climb, stoop, kneel, crouch or bend, could occasionally balance, and was limited in reaching, handling, and fingering. [Doc. #29-8, at D0568-0569]. In March 2007, Dr. Silney found Givens to be alert and oriented and in no apparent distress despite his complaints of back pain. Dr. Silney noted that Givens felt pain "differently depending on his position. Some burning sensation but no tingling or piercing pain." [Doc. #29-6, at D0353]. She continued to prescribe Oxycontin. [Doc. #29-6, at D0354].

On March 7, 2007, the Social Security Administration found that Givens was disabled

from March 1, 2006 through the date of its decision, and granted him disability insurance benefits. [Doc. #29-8, at D0559, D0563]. ALJ Robert Ritter found that Givens suffered from the following severe impairments: "syringomyelia and degenerative disc disease of the cervical and thoracic spine [which] cause significant limitation in the claimant's ability to perform basic work activities." [Doc. #29-8, at D0556]. The ALJ further found Givens' testimony to be credible, and that he "has the residual functional capacity to lift less than 10 pounds. He cannot sit, stand or walk for prolonged periods. He has frequent pain, stiffness, and headaches, which interfere with his ability to sustain concentration, persistence and pace." [Doc. #29-8, at D0557]. According to the testimony of the vocational expert, which the ALJ found to be credible, Givens was unable to perform past relevant work and that Givens' "acquired job skills do not transfer to other occupations within [Givens'] residual functional capacity." [Doc. #29-8. at D0557-D0558]. The ALJ noted that Givens' disability status should be reevaluated after one year. [Doc. #29-8, at D0559].

On May 16, 2007, Dr. Richard Kaplan, a specialist in physical medicine and rehabilitation, reviewed some of Givens' medical records from 2004 through 2007. [Doc. #29-9, at D0584-D0585]. Dr. Kaplan concluded that Givens did not have any functional impairment from February 24, 2006 onward. [Doc. #39, ¶ 36].

On October 1, 2007, Dr. Joann Mace conducted an independent medical evaluation, which included an in-person examination of Givens on September 24, 2007. [Doc. #39, ¶¶ 45, 48; #29-9, at D0622]. Dr. Mace stated that with regard to the cervical spine, Givens might require non-repetitive tasks for the upper extremities or frequent rest breaks. With

regard to the lumbar spine, Givens may require changing positions, no prolonged sitting or standing, no repetitive twisting, turning, bending, or crawling, and no lifting greater than thirty pounds. [Doc. #39, ¶ 46]. Dr. Mace further opined that although Givens' pain complaints were consistent with his medical diagnoses, the ratings he assigned to his pain were disproportionate to what would be expected and were not supported by Givens' physical examination or MRI. [Doc. #39, ¶ 47]. She noted evidence of symptom magnification and somatic complaints. [Doc. #39, ¶ 49]. Dr. Mace concluded that Givens did not suffer from any functional impairment, [Doc. # 39, ¶ 45], because there were inconsistencies on physical examination, overreaction to touch, and extremely high ratings of pain and interference with activities. [Doc. # 39, ¶ 50]. Based on her evaluation, she found that Givens could perform his former occupation as a pharmacy technician. [Doc. #31, ¶ 22].

### 2. Medical History and Reviews from October 2007

From October 2007 through January 2009, Givens had seen Dr. Carolle Silney six times: November 9, 2007, May 15, 2008, August 5, 2008, October 17, 2008, December 4, 2008, January 5, 2009. [Doc. #39, ¶¶ 22, 24, 26, 29, 30; Doc. #20-6, at D0355]. At Givens' November 2007 appointment, Dr. Silney noted that "things are the same." [Doc. #29-6, at D0355]. Givens continued to have "right sided bade [sic] pain up and down with radiation to right arm and leg. . . . Paresthesia on both sides." [Doc. #29-6, at D0355]. Givens also complained that he was "experiencing decreased mobility, numbness, tingling in the arms, tingling in legs." [Doc. #29-6, at D0355].

On December 10, 2007, Givens saw neurosurgeon, Dr. Charles Bondurant. According

to the doctor's notes, he had seen Givens fourteen months prior. Givens reported to Dr. Bondurant that "he has realized improvement in his back pain as well as his right-sided numbing discomfort. He describes he retains some burning numbness in the region of his right buttock and low flank, with some painful numbness in the right lower extremity, though again improved over his previous status." [Doc. #29-6, at D0372]. Dr. Bondurant found that Givens' upper and lower extremity strength built to 5/5 in all groups and that gait was brisk and stable. [Doc. #29-6, at D0372]. Dr. Bondurant informed Givens that an upper thoracic cord cavitation could underlie Givens' symptoms or could be an "incidental asymptomatic finding." [Doc. #29-6, at D0372].

On February 28, 2008, Laurie Martin, a rehabilitation counselor, reviewed Dr. Mace's October 2007 report. Based on the restrictions noted by Dr. Mace in her report, Martin determined that Givens was capable of performing sedentary and light work with restrictions. [Doc. #39, ¶ 52]. After accounting for Givens' age, transferable skills, educational level, work history, and residual functional capacities in conjunction with her knowledge and understanding of the current labor market, Martin found that Givens could be reasonably employed as a customer service representative, information clerk, charge account clerk, night auditor, order clerk, telephone answering service operator, or self-serve gas station attendant. [Doc. # 39, ¶¶ 53, 54].

In May 2008, Dr. Silney noted that Givens was "doing about the same" and that "[t]he problem shows mild improvement (< 50%)." [Doc. #29-6, at D0357]. She noted that the "pain is burning and sharp. . . . [and] is aggravated by sitting and standing" and continued

Givens' Oxycontin prescription. [Doc. #29-6, at D0357].

In August and October 2008, Dr. Silney noted that Givens' lifestyle consisted of "vigourous activity level" and that he exercised 3-4 times a week. [Doc. #39, ¶ 30]. In August, Dr. Silney prescribed a trial of "MS contin 30 mg BID," a form of morphine, after Givens informed Dr. Silney that he could not afford Oxycontin, and its generic form, Oxycodone HCL, was no longer being produced. [Doc. #29-7, at D0421].

On October 17, 2008, Dr. Silney completed a "Long Term Disability Claim Physician's Statement." [Doc. #39, ¶ 32]. Under restrictions and limitations, Dr. Silney indicated that Givens could not focus or stay alert, and often made mistakes. Additional restrictions included the inability to stand or sit for more than one hour at a time and the inability to bend, twist, or lift over ten pounds due to back pain. She also noted: "Exam within normal limits except for diminished deep tendon reflexes in the lower extremities," but that Givens has "achieved maximum medical improvement" and that his condition "will most likely deteriorate with time." [Doc. #29-7, at D0447-D0448]. Dr. Silney indicated that Givens was currently disabled under Prudential's "any gainful occupation" definition, and indicated that she did not believe that Givens could perform the alternative occupations listed on the form: customer service representative, information clerk, charge account clerk, night auditor, order clerk, answering service clerk, and automobile self service agent. [Doc. #29-7, at D0447-D0448].

On December 4, 2008, Givens met Dr. Silney to discuss filling out disability paperwork. [Doc. #29-6, at D0414.] Dr. Silney noted that Givens still experienced "chronic

pain," but was negative for gait disturbance and that he was in no apparent distress, well nourished, and well developed. [Doc. #29-6, at D0414-D0415]. On January 5, 2009, Givens saw Dr. Silney for a refill of his morphine prescription. [Doc. #29-6, at D0412]. Dr. Silney noted that there Givens' pain was "stable," that there were "no acute issues," but also that he had "narcotic dependence for back pain" and a "low activity level" lifestyle. [Doc. #29-6, at D0412-D0413].

In all of Dr. Silney's progress reports from November 2007 to January 5, 2009, she consistently noted that Givens was "alert and oriented." [Doc. #39, ¶ 28]. On January 16, 2009, Givens saw Dr. George Prica, who noted that Givens engaged in a vigorous activity level and exercised 3-4 times a week. [Doc. #29-6, at D0410].

On February 19, 2009, Lesa Keen, a rehabilitation consultant, performed a vocational evaluation report on Givens. From her in-person examination of Givens, she found that he had difficulty concentrating after approximately thirty minutes, became unfocused, and had difficulty answering questions. Based on her observations of Givens during her examination, her conversations with Givens, and an evaluation of Givens' medical records, Keen concluded that Givens did not have the ability to sustain the concentration to work, even on simple, unskilled tasks.. [Docs. #39, ¶ 35; # 31, ¶ 28]. Further, Keen opined that Givens' restrictions and limitations would "eliminate all of Mr. Givens' past work as well as most work in the national economy" as options for gainful employment, [Doc. #31, ¶ 29],and that "until his condition can be resolved of the pain can be treated without the side effects of the medications, he will remain unemployable." [Doc. #31, ¶ 30– check quote(citing D409)].

The April 10, 2009 results of an independent review of some of Givens' medical records from November 2004 to March 2009 by Dr. Phillip Marion, a specialist in physical medicine and rehabilitation, were to the contrary. He concluded that Givens remains completely functionally independent with activities of daily living, fully ambulatory, and not restricted from driving a motor vehicle. [Doc. #39, ¶ 60]. He also opined that the records do not support Givens' complaints of adverse side effects due to pain medications, [Doc. #39, ¶ 61], but rather consistently documented Givens' condition as normal with no evidence of musculoskeletal or neurological deficits. [Doc. #39, ¶ 56].

## II.     Discussion

### A.     ERISA Standard of Review

ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. *See Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998). The Court generally reviews a denial of benefits governed by ERISA de novo. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, where the plan gives the administrator discretionary authority to grant or deny benefits, the Court reviews the administrator's determination for an abuse of discretion. *Id.*

Here, pursuant to the terms of the Plan, a participant is eligible for benefits only "when Prudential determines" that a disability exists. [Doc. # 29-13, at D0830]. The Eighth Circuit has held that the word "determines" "affords the plan administrator discretionary authority to determine benefit eligibility." *White v. Prudential Ins. Co. of Am.*, 354 F. Supp.

2d 1008, 1016-17 (S.D. Iowa 2005) (citing *Clapp v. Citibank, N.A. Disability Plan (501)*, 262 F.3d 820, 827 (8th Cir. 2001)). Here, Prudential both administers the plan and evaluates claims. Thus, for ERISA purposes, Prudential operates under a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114-15 (2009). As such, the Court applies the abuse-of-discretion standard weighing the conflict of interest as a factor in determining whether there is an abuse of discretion. *Id.* at 115-16; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

### B.    Prudential's Decision to Terminate Benefits

At issue is whether Prudential abused its discretion when it determined that Givens was not disabled under the "any occupation" definition on or after August 23, 2008. By definition, an individual who is considered disabled under the "any occupation" definition necessarily is disabled under the "own occupation" definition–if a person is unable to work in any occupation, then that person cannot work in their former occupation. Here, Givens appears to argue that he was under a "total disability" from "the time he stopped working and applied for benefits through the time benefits were denied." [Doc. #31, at 41]. According to Givens, this means that he was disabled under the "any occupation" definition prior to August 23, 2006, the first day that Prudential considered Givens disabled under the "own occupation" definition. Prudential contends that Givens had never been disabled under the "own occupation" definition, either based upon its review of his medical records through October 2007, or its subsequent reviews after Givens provided additional information during the appeals process.

"Applying an abuse of discretion standard, the 'administrator's decision to deny benefits will stand if a reasonable person could have reached a similar decision.' " *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 346 (8th Cir. 2007) (quoting *Hillery v. Metro. Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006)). *See also Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006) (Under the abuse-of-discretion standard, the plan administrator's decision is reversed "only if it is arbitrary and capricious.") (quoting *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)). " 'A reasonable decision must be supported by substantial evidence, which is more than a scintilla but less than a preponderance.' " *Ratlift*, 489 F.3d at 346 (quoting *Hillery*, 453 F.3d at 1090). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.*

Under ERISA, plan administrators do not have to give greater weight to the opinions of a claimant's treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003). Where medical records conflict, a plan administrator does not abuse its discretion by finding the employee is not disabled. See *Rutledge v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 660 (8th Cir. 2007). "A plan administrator's discretionary decision is not unreasonable merely because a 'different, reasonable interpretation could have been made.' " *Parkman v. Prudential Ins. Co. of Am.*, 439 F.3d 767, 773 (8th Cir. 2006) (citing *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004)). Under these circumstances the Court cannot substitute its own decision if substantial evidence existed to support Prudential's decision. *See id.*

### 1.    Laurie Martin's Report on Givens' Capacity to Work

The Court finds that it was arbitrary and capricious for Prudential to have only sent Dr. Mace's report to rehabilitation counselor Laurie Martin when there existed other physician reports indicating limitations on Givens' abilities. For example, Dr. Silney noted in July 2006 that Givens was limited to lifting only ten pounds, and in February 2007, she noted that Givens had the maximum capacity to occasionally lift five pounds. Both of these assessments contrast with Dr. Mace's opinion that Givens could lift up to thirty pounds. This is relevant information that should have been made available to Martin during her evaluation. Because Prudential did not provide Martin with all of the records relevant to Givens' capacity to work, Martin's report was an "incomplete and inaccurate representation" of Givens' ability to work. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (finding it "inexplicable" why insurance company sent only one physician's capacities evaluation for review by a vocational consultant).

Prudential appears to argue that it was not necessary for Martin to review Givens' medical records in order to render a vocational opinion, and additionally, such a review would have been  inappropriate as Martin is not a physician. [Doc. #36, at 19]. However, even if a vocational expert does not need to review an entire medical file in order to render an opinion, here, Martin was not even provided with Dr. Silney's suggested restrictions and limitations. *See Morris v. Am. Elec. Power Long-Term Disability Plan*, No. 08-4412, 2010 WL 4244120 (6th Cir., Oct. 15, 2010) (finding that it was not an abuse of discretion to send a selective file to vocational consultant when consultant was also provided with the "most

favorable" report of claimant). Thus, Prudential abused its discretion by sending a "cherry-picked" file to Martin that consisted of only one physician's recommended restrictions. *See, e.g.*, *Spangler*, 313 F.3d 356; *Franklin v. AT & T Corp.*, No. 3:08-CV-1031-M, 2010 WL 669762, at *6 (N.D. Tex., Feb. 24, 2010) (citing *Spangler*); *Mikrut v. UNUM Life Ins. Co. of Am.*, No. 3:03cv1714 (SRU), 2006 WL 3791417, at *8n.7 (D. Conn., Dec. 21, 2006) (citing *Spangler*); *Kochenderfer v. Reliance Std. Life Ins. Co.*, No. 06-CV-620 JLS (NLS), 2009 U.S. Dist. LEXIS 112954, at *20 (S.D. Cal., Dec. 4, 2009) (citing *Spangler*); *Garner v. US W. Disability Plan*, No. 05-cv-0016-PSF-BNB, 2006 U.S. Dist. LEXIS 19380, at *20 (citing *Spangler*).

Prudential's arbitrary actions with respect to a vocational expert's report does not alone indicate that its ultimate decision to deny benefits was an abuse of discretion. *Spangler*, 313 F.3d at 362 ( "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious."). However, Prudential could not have made a determination that Givens was disabled under the plan's "any occupation" definition unless it relied on Martin's report that Givens could perform a job for which he was qualified. See, *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. #506*, 545 F.3d 555, 561 (7th Cir. 2008); *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir. 1989) ("Without [a qualified opinion from a vocational expert], we cannot say there was substantial evidence to support the Plan's decision [to deny benefits]."). Here, because Martin's report is foundationally flawed,

Prudential could not have reasonably relied upon it to support its decision. Moreover, there is no other vocational analysis in Givens' file–either from an expert report or Prudential's own inquiry–that supports Prudential's conclusion that Givens was not disabled under the "any occupation" standard. Notably, Prudential did not rely on Dr. Mace's report regarding Givens' vocational abilities. Not only is Dr. Mace not an expert in the field, Prudential concedes that she incorrectly concluded that Givens could return to work as a pharmacy technician despite his permanent physical limitations, which she listed on her report, that prevented him from performing his job duties. Additionally, Prudential chose to reject the report of Lesa Keen, a rehabilitation counselor who, before issuing her report, not only reviewed Dr. Mace's report, but also reviewed other medical records in Givens' administrative file and personally examined Givens. [Doc. #29-7, at D0451]. Thus, there is no evidence, let alone substantial evidence, that supports Prudential's decision that Givens could be employed in an occupation for which he was fit by education, training or experience.

### 2. Dr. Marion's Medical Records Review

Prudential also argues that Givens' medical record shows that Givens "retains the functional capacity to work in alternate gainful occupations" and that there is "no evidence that Givens suffered from cognitive difficulties due to medicinal side effects." [Doc. #39, at 26]. In support of its denial, Prudential relies on Dr. Marion's findings that "there remains no objective impairment to support any specific occupational restrictions/limitations," [Doc. #29-10, at D0724]. However, this finding by Dr. Marion conflicts with Dr. Mace's

conclusion that Givens is under permanent limitations, including no prolonged sitting or standing, no repetitive twisting, turning, bending, or crawling, and no lifting greater than thirty pounds. [Doc. #29-9, at D0627]. Dr. Marion did not explain why he departed from Dr. Mace's findings regarding Givens' physical limitations, nor did Prudential explain why it believed Dr. Marion's opinions over other physicians who had examined Givens, including Dr. Mace. Because Prudential relied upon Dr. Mace's report to support both a prior award of disability benefits under the "own occupation" standard as well as its initial denial of Givens' claim under the "any occupation" standard, it was arbitrary and capricious for Prudential to fail to explain  why it now relied upon Dr. Marion's seemingly contrary opinion. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) (finding that administrator's termination of benefits was arbitrary and capricious when it relied on a physician's opinion that did not explain why it departed from other physician's opinions previously relied upon by the administrator).

Additionally, Dr. Marion noted in his report that an independent medical evaluation deemed Givens "capable of resuming his prior occupation as a Pharmacy Tech," [Doc. #29-10, at D0724], which Prudential quoted in its letter denying Givens' appeal. [Doc. #29-10, at D0724]. The only independent medical evaluation in Givens' records that asserted this opinion is that of Dr. Mace.  Prudential, however, had rejected this portion of Dr. Mace's report when it found that Givens could *not* resume his position as a pharmacy technician. Prudential's current adoption of Dr. Mace's opinion–that Givens is capable of resuming his former position–via adopting Dr. Marion's opinion, is a departure from its previous position.

Again, while it is within Prudential's discretion to switch course, it is arbitrary and capricious for it to fail to explain why it has done so. Indeed, Prudential admits that Dr. Mace did not receive an explanation of Givens' job duties and that her opinion that Givens could perform the duties of his own occupation was based only on her own insight. [Doc. #36, at 15].

### 3.    Givens' Cognitive Deficits

In its letter denying Givens' appeal, Prudential stated that "[t]here is no medical evidence to corroborate with your statement that Mr. Givens' cannot sustain concentration to work," and referred to Dr. Marion's report for support. [Doc. #29-10, at D0724]. Dr. Marion had reviewed Givens' medical records through January 2009, which included information that Givens was placed on a different pain medication–morphine sulfate–on August 5, 2008. Prior to this time, Givens had been prescribed various painkillers, including Oxycontin, Lyrica, Skelaxin, Lortab, Limbrel, Darvocet, and ibuprofen. Dr. Marion's report stated that "[t]he medical records do not support significant adverse side effects (including cognitive deficit) from any medication or combination of medications," but did not explain his reasoning. [Doc. #29-10, at D0724].

The only physicians to have examined Givens after he was placed on morphine were Drs. Silney and Prica. Further, only Dr. Silney had commented on the effect of morphine on Givens: "narcotic dependence for back pain," [Doc. #29-6, at D0412], "inability to focus, stay alert[,] makes mistakes often," and "alert and oriented" at each examination. [Doc. #29-7, at D0448]. Dr. Marion failed to point to any evidence to support his conclusion, which was contrary to that of Dr. Silney–the only physician to examine Givens and opine on how

morphine affects him. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan Administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. . . . [Courts may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Thus, without more, Prudential's reliance on Dr. Marion's conclusory statement is itself a "bald-faced conclusion" that does not satisfy ERISA's notice requirements. *See Richardson v. Cent. States, Se. & Sw. Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir. 1981); 29 U.S.C. § 1133.

### 4.    Conclusion

Based on the foregoing, and after weighing Prudential's conflict of interest as a factor, the Court finds that Prudential abused its discretion in denying Givens' appeal for long-term disability benefits. While the Court notes that Givens' medical records demonstrate a range of medical opinion regarding the pain he suffered, the extent the pain diminished his physical capabilities, and the extent that various pain medications hampered his mental faculties, that does not alter Prudential's abuse of discretion in the manner it reached its decision to deny Givens benefits. The Court does not express any opinion as to whether Givens' benefits should be terminated in the future.

## III. Conclusion

Accordingly, it is hereby ORDERED that Prudential's motion for summary judgment [Doc. #29] is DENIED and Givens' motion for summary judgment [Doc. #30] is GRANTED.

                                             s/ NANETTE K. LAUGHREY
                                             NANETTE K. LAUGHREY
                                             United States District Judge

Dated: January 20, 2011
Jefferson City, Missouri